If it pleases the Court, David Rosenfeld on behalf of the petitioner Local 399 would like to reserve four minutes for rebuttal. The Labor Board in these kinds of cases traditionally looks to see whether an employer's reasons for taking some action are pretextual, whether they're shifting reasons, whether the reasons are implausible. In addition, the Board looks to timing. And finally, often disposited, is whether the employer has expressed any animus. For example, simply said, we took the action because of the union. These elements are here, and I want to address the first two and then really focus upon the animus, because not only did the Board get it wrong, they got it clearly wrong in terms of the record. Counsel, we are reviewing the findings of the Board, not of the administrative logics, correct? Correct. And the standard now is some evidence or clear evidence or a preponderance of the evidence or overwhelming evidence. What is the standard by which we look at the Board's findings with respect to fact finding? Substantial evidence. Substantial? That is the standard since University of Cameron reviewing Board decisions. Okay. With respect to the issue of implausibility, shifting reasons, the judge got it right in the part of the decision that the Board adopted in which he said there was a seeming lack of clear rationale for the way the subcontracting was conducted. He says on the surface it appears to be a fabrication, not a good one. And he finally says that the reasons expressed by the Respondent lack plausibility. I just want to hit upon four points to show why, in fact, he was correct in those findings and why there is substantial evidence in the record that the reasons were shifting and implausible. First of all, Theodore Wiener, who takes over as the manager of this department, says he couldn't see any reason why he couldn't have done it simply as an employee of the hospital. Eleanor Ramirez, who is the manager who is responsible, says the only thing that they accomplished was get a manager. She can't express a plausible reason why they really had to eliminate the respiratory therapist as employees and subcontract, make them subcontractors. The second thing that makes this highly implausible, and the judge understood that, findings confirmed by the Board, was that the hospital conceded that this whole subcontracting was very expensive. In most of the Board's subcontracting cases, the employer says we have to subcontract because either we can't do it or because it's we save money. Here the term very expensive was used by Ms. Yu, that's Yu, who was the coordinator in charge of this department. She conceded it was very expensive to subcontract the employees and hire Theodore Wiener. Well, it's obvious why it was very expensive, because it was a cost-plus contract. They now had three supervisors in the department, that is Amundsen, Suarez, and Wiener. They had a 17 percent benefit cost on top of this, and the hospital agreed to pay all these respiratory therapists severance under their severance program, even though they weren't losing their job and nothing was happening to them. They were retained by the hospital. Finally, the hospital agreed to pay their health care benefits for a period of time until that was picked up. So it's understandable that this is very expensive, and it's understandable why this would be highly implausible to take action. It's very expensive to solve a very singular problem, which is to find a manager for the department. The next point is that Ms. Yu testifies and gives the shifting reason. She says, you know, we've had all this turnover in managers. And she says, nothing wrong with managers we had. They were very skillful. They had years of experience, like Ray Hancock. By outsourcing the company would then provide the manager, that is, by outsourcing to someone else, they'd provide a manager. So she highly compliments Ray Hancock. If you remember what happened, in early 1999, there was a woman named Barbara Amundsen who ran the department. She was moved out. Ramon Suarez, who was the supervisor, was shifted in terms of his hours, and Ray Hancock was brought in. So the hospital says these are good managers. And finally, the point that seems to me most effective in terms of why this is all implausible and pretextual is that the hospital and the board all argue, because they use the word that was used by the hospital administrators, that they did an exhaustive search. They made an exhaustive effort to solve this manager problem. Exhaustive search is the word that Eleanor Ramirez used to excerpt the record 700. And Bill Parenti, who was the president of the hospital, said, we were unable to find, recruit, train, provide qualified managers. That's a fabrication, because all that happened was, in early 1999, Barbara Amundsen was moved out, Ramon Suarez was brought in, and Ray Hancock was brought in. Now, remember, he's brought in as the manager, but he manages two other departments at another hospital. The cardiology department at this hospital, he's a quarter-time manager at best in this department. So there's no exhaustive search. There's nothing that matches or meets unable to find, recruit, train, provide qualified managers. For a year, they've done nothing, until suddenly, December of 1999, they take what we've described as frantic action, which is the timing issue which I want to move on to. And I'm going to take about five minutes with timing, and then I'm going to hit the analyst, because it's the analyst that I think is where the board clearly got it wrong, because there was substantial evidence which the board's decision just was wrong about. And there's another issue with respect to that. Everyone agrees, and the judge found, that the union's activity at this hospital increased in the middle of 1999, beginning of July of 1999. There are rallies. There are organizers in purple T-shirts there. They go into the cafeteria. They're collecting cards. They're doing what unions do to organize, and they have a coordinated campaign against this hospital. In November of 1999, a leaflet is passed out saying, we've got enough cards. We're going to be filing the petition shortly. The hospital's on notice. They have that leaflet. So they're well aware of the union's increased activity and the likelihood that the union is going to file a petition with the labor board to represent the technical employees. Now, the respiratory therapists are about one-fourth of the technical employees, and, as found by the judge, conceded by everyone, are the most vocal union supporters, the ones who are the core of the organizing effort. Now, the hospital has problems. There's no doubt that they recognize problems in this department. And we know that in November 18th, there's a meeting of the managers in which they say they testify, they talk about subcontracting, and they say they'll do some investigation. But we know between November 20th and December 22nd, when the decision is made to look further into subcontracting, no action is taken to subcontract. It's left alone. And we know that on December 22nd, there's a meeting, there's actually two meetings, one meeting and then another meeting the next day, where they decide not to subcontract but to investigate the feasibility of subcontracting to start looking into it. We don't know, I mean, they don't explain any reason why they then have to, when they make this decision to look into subcontracting two days before Christmas, why they then have to meet with the employees the day after Christmas, it's actually the 27th, it's Monday morning, to announce not the decision to subcontract but the intent to investigate subcontracting. And that's what Ms. Yu tells the employees, the feasibility of subcontracting. And there's a critical document, which is at the exit of record of 77, which is an e-mail that shows some e-mail communications from the hospital, where Ms. Yu says to the doctors, we're only looking at the feasibility of this. Yet the employers are told the morning of the 27th, we're looking at the feasibility of subcontracting. Now, all this arises in the fact that the hospital is aware of increased union activity and the threat of a petition. Now, I just want to back up on that, because credibility becomes an issue, and the judge doesn't comment, and the board doesn't comment on this in its findings. When Ms. Yu was asked, did you know anything about a petition or the possibility of a petition being filed, her response was, I had no inkling that a petition would be filed. Well, that's contrary to the board's findings, which are, in fact, the judge's findings, that the hospital was well aware of all this union activity and that these workers were the core of the union activity. Now, what's important about this timing is on the morning of the 27th, the respiratory therapists are told we're going to investigate subcontracting. Well, this causes a storm, and this is the timing issue. You have to focus on the next three or four days, because this e-mail, again, 707, indicates that Hancock, who was in charge of the department, is upset because he wasn't consulted about this decision. The doctors are upset because they weren't consulted about the decision. Why is the rush to announce this decision? Doctors are upset. Hancock is upset. The doctors are upset because this is the worst time to do this. The e-mail says they are upset, and there's other testimony confirming this, other record evidence, that they're upset because it's the flu season, the height of the flu season. They don't want to upset the fact that this is when they're the busiest time of the year to make this kind of a change, and the employees are critical to taking care of this. And they're also upset because they weren't consulted. And ZDU, in the top part of the e-mail, tries to explain, and I want to quote this, what ZDU says in this e-mail is, there never will be a good time when to tell the staff, actually, this is a test, because we should be able to handle this situation on a peak time rather than when it's slow. That shows to suggest to me the record is clear that the decision to announce the intent to investigate or look at the feasibility of subcontracting was done in response to this context of the union organizing. If you go further, what happens is nothing immediate happens right after January 1st, and the employees saying, assuring them that there's no decision yet been made to subcontract. This is on what day? January 12, 2000. He says there is a careful process leading up to a decision. Tries to calm everyone's concerns, and that's an appropriate thing to do, except seven days later, the hospital stipulates to an election to be held on February 16th. If they're going to subcontract, they have to get it done before February 16th, otherwise those workers participate in the election. So now they're stuck. They have to get it done by the 15th. And there's a critical piece of evidence in the record, because Theodore Wiener testifies that he doesn't make an initial proposal to subcontract. He says, I'll do it myself. I'll hire him. He sends in a resume. And he testifies that one of the reasons his resume was rejected was because he couldn't get it done by February 15th. He expressly says he's one of the reasons his proposal was rejected was because of this February 15th date, the day before they had to get this subcontracting thing completed. That's the evidence of timing. And then just one other point about timing is that it all is a rush. They decide on the 26th to accept a proposal that's an incomplete proposal, announce it on February 1. Wiener is there. He's unprepared. He has no documents to give these people. Gives them a one-page document two days later on February 3 that just outlines their benefits. February 5, they're fired by the hospital, employed by Wiener. Nothing changes. But it's all accomplished before February 16th, so they're out of the bargaining unit. Let me go on to Amnesty, because there I think, as I said for the third time, the Board got it wrong. The Board got it right in adopting the judge's decision in which he said if there's any evidence of amnesty, announce. Any evidence that the hospital did this for the improper motivation he would have found in favor of the general counsel of the union. Well, it's clear in the record that the employer wasn't neutral to union organizing. The supervisor was instructed to keep track of it. Ray Hancock, in fact, uncontradictorily told the employees that they didn't need union representation at various meetings. I don't think any of that's dispositive. It sets the context. But the Board's findings got it wrong in an important footnote. Jerry Moore, who's one of the therapists, says that in January, a leaflet is passed out with his picture, January 10th, and that after that, Ray Hancock comes to him and makes a comment about your picture being in this leaflet. The judge discredits Jerry Moore because he says Ray Hancock vigorously disputes it. That's the last footnote in the decision. In our brief, we point out that's incorrect because Hancock was never asked about that. He never denied it. There is nothing in the record. And you can ask opposing counsel, because all the Board cites in its brief is the finding of the judge, not a place in the record, was never rebutted. So that piece of animus is in the record. The second and very critical piece of animus, which seems to me is overwhelmingly convincing, is that on the 27th, when ZTU announces the decision to investigate subcontracting, she makes a brief announcement, leaves the meeting. Four employees testify that after the meeting is over with, Ray Hancock has a little rump meeting in which he says to the workers in response to a question that Jerry Moore asked, yes, it's because of the union we're doing this. All four report that statement. Now, this case can rise or fall on that. If the Board credited that statement that Hancock, the manager who was involved, says it's because of the union, that's the animus. The Board makes no finding on that statement. And again, the Board's brief concedes it because all they say is that Hancock denied that conversation, which I agree. The record clearly denies it. But four workers testified he said it. But the Board doesn't resolve that credibility finding. There is no finding. There's substantial evidence he said it, but no finding by the Board. They ignore it. The judge was sloppy and the Board was sloppy here. The footnote is wrong. The evidence is in the record. And the final two points of animus before I'll stop here is that we asked the Board to take judicial notice of another decision involving St. Francis, another Catholic Healthcare West hospital. The Board got sloppy and simply said, well, there is an administrative law judge's decision finding a number of violations. In fact, it's hard to count, but there are like 15 or 16 various violations, all occurring in 1998 at a sister hospital, same employer. And the Board said we're not going to take judicial notice of the judge's decision of these events occurring before all this to show animus because the judge's decision isn't final. I filed a supplemental citation. That decision is final. The Board affirmed all those findings. There are 15 or 16 of them. That is animus. I asked the Board why now that shouldn't be relied on to prove animus. And there are Board cases that traditionally use findings of animus in one findings in one case to show animus in another case, as long as it's the same employer. And Opelika Welding is the Board's principal case. It's found at 305 NLRB 561. So there's more than overwhelming substantial evidence of animus. The judge got it wrong on his footnote. The Board made no finding to discredit. The four witnesses who said Hancock attributed the subcontracting to the union. And we've got the St. Francis decision now finding violations by this employer which go to the animus. I reserve the remaining time for the Board. Thank you. Good afternoon. My name is Meredith Jason, and I represent the Board in this case. I'd like to give five minutes of my time to Mr. Letter, who represents the intervener hospital in the case. Here the Board reasonably found that the hospital did not violate the act by subcontracting the R.C. Department. First, the judge, affirmed by the Board, found that the hospital was not unlawfully motivated. And second, the Board, in the alternative, found that even if the hospital was unlawfully motivated, it proved its affirmative defense that it would have taken the same action even in the absence of union activity. Now, first, with respect to the finding of that there was no unlawful motive, the First, the judge looked at the fact that there were absolutely no independent violations of the act alleged here. No threats, no unlawful interrogations. The entire time, the union was present at the hospital, which was from 1998 to the year 2000. Now, that's very unusual, and the judge had every reason to look closely at that. In addition, the judge looked at the fact that You're talking about the ALJ, right? Yes. Which is affirmed by the Board. Yes. Okay. And in addition, the judge, affirmed by the Board, looked at the fact that the hospital considered and discussed subcontracting as far back as July 1999, which was months before the union's petition was filed. There was a conversation between Manager Yu and Manager Ramirez where they discussed the problems in the RC department, recognized the severity of them, and discussed the fact that they had, the hospital had in the past, looked to subcontracting as a way to remedy similar problems. They had done it in the OT department, the PT department, and the speech department. The judge makes several observations in the course of what's an unusual opinion, I think, and one of them was that although they discussed subcontracting, there didn't seem to be, you know, any immediacy about it or anything else. It just kind of drifted along. I mean, he makes several. I think that's, you know, certainly fair to point out. And I think what is unusual and important about this judge's decision is that he obviously thought a great deal about how this case should come out. He weighed all of the evidence. He probed the timing. He probed the evidence here. He did not rush to judgment in any way. He understood that because the subcontracting actually took place during the critical period, that, yes, it does raise, you know, a question. And he knew that he had to look closely at the testimony. And he did that. He looked at the conversation in July. Yes, at that point they realized, let's give it a little more time. Do you agree that Hancock didn't deny any statement? I do. No, I do not. The footnote is correct. The footnote explains that Hancock denied any of these alleged off-the-record comments. One of the comments that was, that Moore testified he made was, off the record, he said to me, it doesn't help that you have pictures on this pamphlet. Now, in the judge's footnote, he credits Hancock's denials. And what Hancock denied was making any of these alleged off-the-record comments. He said, I never said anything off the record. Anything that was suggested I said off the record, he denied. One of those things was this alleged comment, you know, your face doesn't help to have your face plastered on that. So I feel, so the judge's footnote is correct. He credited all of those denials. In addition, he credited any denials of any similar remarks. So any, and Hancock specifically denied that he never said, I don't like unions, unions are bad. Any of those comments have been specifically denied and credited. And the union has given no basis to reverse those credibility findings. And as you're aware, it's very difficult to argue that credibility findings should be reversed when they've been made by the judge who witnessed the testimony and then affirmed by the board. I wondered, there's some reflection in the judge's opinion that his view of the sort of good faith of the subcontracting arrangement was somewhat influenced by the fact that it seemed to have worked out post-Holk. Well, he did look to the fact that it was successful, which is not, he couldn't have made the decision completely on the fact that it turned out to, it seems to have worked. He considered it, but he considered it as part of all of the other factors. I mean, one thing that was also extremely important was that it was consistent with the hospital's past practice, not just subcontracting, but subcontracting in the way that they did it. They had never before just subcontracted for a manager. The only time they have subcontracted in the past was the three times they subcontracted the entire department, and it was a way to solve similar problems in similarly sized departments. That is how the hospital had done it in the past, and to say here they should have done it differently is simply to substitute here the union's business judgment for the company's, and that's simply not permitted, and the Board could not, could not substitute its business judgment either. And to say that they, oh, yes, they needed a new manager, and they had every right to try to have a new manager, and they, but what they should have done was hire Ted Weiner as a manager, that's a losing argument, Your Honor, because. There was considerable strength, potential votes in the, in that department, wasn't there? Yes. And all this subcontracting happened just, what, two days before the vote? The ultimate subcontracting happened during the critical period, yes, and the judge certainly looked very closely at that fact. Didn't he make some comments about it? It certainly looks suspicious. Yes, he did. What did he say? He said that at first glance it looks very suspicious. Yeah. But then when he went on and probed the evidence and, and looked at the evidence. He said a little bit more than it looks suspicious, didn't he? He found that the actual timing of it at the critical period was, you know, was evidence that could support a finding, it could support a finding of an unlawful motive. But here, in light of all the circumstances, the lack of any animus, the past practice, the other evidence that they had considered this months before the petition was filed and that they had announced it to the employees before the petition was filed and, in fact, set forth a time frame at that point and said if we go through with this, it will be within 30 to 60 days. I mean, they said that to the employees December 27th before the petition was filed. And so the judge, yes, he looked at the actual timing of the subcontracting. But to his credit, he looked very closely at the evidence here. And he weighed it. And in the end, he found that you could not say that there was an unlawful motive. Now, what's important, which my opponent overlooks, is that the board went one step further. It said even if we say they were unlawfully motivated, even if we say the general counsel thought that there was a business reason for it. That then the burden simply switches to the company. And here we find that the company satisfied its affirmative defense of showing a legitimate business purpose. The board at this point, it simply cannot substitute its It wasn't going to cost more money. It was going to cost more money. Yes. But, I mean, again, it's not a judgment of whether the board, you as a judge, think it's the best decision. The question that must be asked is whether it's a legitimate business reason, not whether it's the smartest, not whether it's the most foolish, but whether it is a legitimate business reason. The board picked up on what you just emphasized, the 30- to 60-day point. And it's probably its most significant finding is in their footnote, the board, not the ALJ. And if that's, it's December 27th, apparently when that 30- to 60-day thing is announced. Correct. Was, wasn't there an indication that an election was imminent? I don't, I think, I don't think it's fair to say that there was an indication that an election was imminent. All that was, all that's in evidence was that in November, the union circulated a single petition that said, you know, we have hundreds of signatures and we're going to ask for an election soon. Now, hundreds of, first of all, there are, there were only 100 individuals in the, in the technical unit in which the election was going to be. So, obviously, this included other units that the hospital, that the union was also attempting to organize, which is the service and maintenance unit. Because there was a subsequent petition filed for that unit. So there's no evidence that the hospital knew that this single flyer meant that there was going to be an election petition filed on January 5th. Absolutely no evidence. But they knew there was going to be an election petition that was going to be filed very soon. Well, they knew that the union hoped to file for an election. They didn't know what unit it was going to be in. And they certainly didn't know when. And there's no evidence that. Very soon. And they knew, isn't there evidence here that the employer was aware of the extent of the organizing activities? Well, the, excuse me. All the rest of it? The evidence is that the union had been on the scene for almost two years. And that, yes, there was an increase in activity. But the judge specifically found that to hospital management, there were no noticeable peaks and valleys in this organizing effort. The union did testify and put on evidence that it did increase activity. But the finding by the judge was that there was not a noticeable increase in union activity. He said that a union had been nosing around for two years. And to the hospital, there really was no notice of – there was no noticeable increase at that point. Had there been a kind of history of anti-union animus? No, there wasn't. In fact, the judge specifically found that there was nothing in the history of this employer that suggested – in the history of their labor relations that suggested union animus. That was a specific finding by the judge. The Catholic Charities. There was no argument. In fact, I believe the general counsel specifically said that they were not making an argument that the parent organization was some type of recidivist or anything like that. And so that was not an argument being made. The archdiocese has a reputation of being anti-union, right? I mean, we know that. Well, that was not a finding in this case. No, but I mean – So there's certainly no – the judge's finding here, his specific finding here, was that there was nothing in this hospital, St. Vincent Labor Relations History, to suggest any animus. Do you have a comment on that? I just wondered if you had a comment on the February 15th deadline that Wiener said, well, I couldn't put it all together myself by February 15th, which was the deadline. The main reason his initial proposal was rejected was not the timing. It was the finances. It was just frankly too expensive. Well, okay. And they felt they should be able to get it. I mean, they knew it was going to be expensive. It has to be the February 15th. I mean, 30 to 60 days is the timeline from December 27th. And if it had been 60 days, of course, all these employees could have boarded in there. Right. And the fact – if they really thought it was going to be that imminent, the hospital might have said it was 10 to 15 days. You know, 30 to 60 days doesn't suggest that this is an emergency, you know, something that they are frantically trying to put into place, as the union suggests. The Corporation of the Catholic Archbishop of Los Angeles was never joined as a party in this case. Is that correct? That is correct. That is absolutely correct. Oh, the Catholic Charities is a separate entity. This is not the Catholic Charities. This is a hospital corporation. Yeah, I cannot speak really about anything about the Catholic Church, Your Honor. And it's – yes, it's a separate business entity. And if Your Honor said nothing further, yes. Thank you. Thank you. May it please the Court, I'm Gordon Letter of Litman Mendelson. I represent St. Vincent's Medical Center, a California nonprofit corporation, part of the Daughters of Charity Health System, Inc., which purchased this facility, the St. Vincent's Medical Center, effective January 1, 2002, from Catholic Healthcare West. Counsel for Petitioner raised what he called implausibility and shifting reasons, but what we're really dealing with there is business judgment. The subject of subcontracting, based on the administrative law judge's decision affirmed by the board, as well as in the record, indicates subcontracting had first come up as a subject of discussion in early July of 1999 and was discussed again in November on the 19th of 1999, on December 20th, 1999, and finally in a meeting with the ultimate decision-maker, William Parente, the president of the hospital, on December 22, 1999. In that meeting, it was indicated by Ms. Hill, the vice president of human resources at the time, that there was never a good time to make an announcement to the department with regard to the prospect and investigation of subcontracting. There was concern that the respiratory care was a small community, that word would leak out, and it was imperative to make a prompt announcement, which led to an announcement being made very shortly after the Christmas holiday. The — as the counsel for the board has indicated, the business judgment that was exercised is not shown to be anything other than lawful as far as the evidence in the record is concerned, as so found by the administrative law judge and as affirmed by the board. As far as the timing issue is concerned, the administrative law judge cited the board authority to the effect that timing in and of itself does not constitute an adequate basis to find a violation of Section 883 of the National Labor Relations Act. And the administrative law judge, as counsel for the board indicated, probed this record thoroughly and was very concerned about whether or not there was any independent allegation with regard to unlawful motivation. In fact, in excerpt of the record, page 58, the administrative law judge asks Ms. Ann Pomerantz, counsel for the general counsel, in this hearing whether there is any intention to contend that there is independent violation of Section 801 of the Act. He not only asked her once, he asked her twice. And in both instances, Ms. Pomerantz answered the question no. Ms. Pomerantz was also asked in that same colloquy whether or not it was the general counsel's position with respect to remedy in this case to be seeking something broader than an order against St. Vincent's Medical Center by virtue of asserting there was a responsibility on the part of the then-corporate parent, Catholic Healthcare West, for whatever reason the general counsel elected to contend. And the response that is given on page 59 of the excerpts of record by Ms. Pomerantz is no, we are not seeking a remedy against the corporate parent, to the extent that the St. Francis Medical Center is a center that was also part of the purchase by Daughters of Charity, and the counsel for the petitioner has raised this issue in an additional citation to the Board of a decision having issued. I point out to the Board what is in the record, that the general counsel never had an intention of pursuing anything against a corporate entity, whether that be Catholic Healthcare West, or the St. Francis Medical Center. If counsel for the petitioner truly believes there is further remedy to be sought, that is an issue to be taken up with the Board and not with this Court, where the Board said at the time that there was simply an administrative law judge's decision pending. So going back to the timing issue, with respect to timing, the administrative law judge concluded after thoroughly examining the record that I find no evidence of that this timing itself is sufficient to establish a violation and cited the Board authority to that effect. With respect to the final factor of animus, the — I've already pointed out that the general counsel admitted that there was no independent 8A1 being pursued. I would also point out there's nothing in the record of the proceedings indicating that the general counsel ever moved to amend, to assert an independent violation of 8A1. I agree with what counsel for the Board has said with regard to the examination by the administrative law judge of Mr. Hancock when he testified with respect to denial of both making any anti-union statement as well as ever having used the record in the conversation that Mr. Moore testified to. The administrative law judge then made a credibility finding that he credited Mr. Hancock's adamant denials of that testimony by Mr. Moore. The Board affirmed that ruling and indicated in its footnote under the standard drywall test that it takes a clear preponderance of the evidence to override a credibility finding, and the Board apparently did not believe the record contains very appropriately a clear preponderance of evidence to override the administrative law judge's determination. Kennedy. This is the hospital you see right from the freeway, right, as you drive downtown, a big, huge building. Your Honor, I'm not certain that you can see this from the freeway because it's located on 3rd Street at approximately Alvarado, and that's quite a distance either from the Hollywood Freeway, which would be to its north, almost directly to its north, and it also would be quite a distance from the Harbor Freeway in the downtown, which would be immediately to its east, Your Honor. What is that big building that you can see from the freeway? Are you talking about downtown, Your Honor? Yeah. I'm sorry, Your Honor, I do not know what you're referring to. A huge hospital. A huge hospital downtown. I think it was St. Vincent's. Your Honor, I apologize, but that is not this St. Vincent's Medical Center, and if you can see it, it's not something I'm familiar with. I have to say I would doubt it on the basis of what I know about the location of this hospital. I see that my time is up. If the Court has any other questions, I'd be happy to attempt to answer them. Otherwise, as I see it, my time is up. Thank you. Thank you, Your Honor. Mr. Lutter is correct that at the time all these events occurred, this was owned by Catholic Healthcare West. This hospital was later sold, but this hospital was later the subject of a case, Judge Pragerson, that you wrote a decision in called Service Employees, Article 399 v. St. Vincent's. And that case reflects this history of this hospital being owned by CHW, Catholic Healthcare West, when these events occurred, later being sold to Daughters of Charity, which is owned by now. But the important point from our point of view is that the St. Francis decision, which the Board declined to take judicial notice of, was Catholic Healthcare West, the same employer, a different hospital. And counsel, neither Mr. Lutter nor counsel from the Board, can explain why the Board simply says we declined to take judicial notice of St. Francis Medical Center because it's pending. It's not pending anymore. It's decided. Either this Court accepts those findings of violations by the same employer or remands us to the Board to say, okay, Board, you made all these findings. Does that change your view that this employer has animus towards unions and showed it in 16 different violations in 1998 in a sister hospital? The second point is that at the excerpt of record, page 68, Mr. Wiener very clearly says that even though he offered to take over management of the respiratory care department, he was told he couldn't meet their deadline of February 15th. In fact, what he did was he said early in January, I can do this, but I need more time because I have a small company. He said, I can personally take over management in 30 days, which would have met their assertive schedule, but I can't take over the employment relationship for 60 days. And the reason the February 15th date wouldn't meet their deadline was because they had to get these people off their payroll by February 16th, and it wasn't sufficient simply to bring him in as their manager. The final point is this issue of animus. All I can do is cite to the record what Jerry Moore says is that he was present on the 27th, when after ZVU leaves and Roy Hancock is there, Jerry Moore is the one who says to Roy or Ray Hancock, you know, what's the reason for this? And Hancock says it's the union, and three other employees confirm that. The record at the excerpt of record at 3, at 272, 275 is Moore's testimony. He's then asked about a later incident occurring after January where Hancock approaches him about the picture. At pages 344 and 45 of the record, Hancock is asked, did you ever make any statements on the 27th about the union? Did you ever make any statements about the off the record? No, I never said anything like that. I agree he denied it. And all I can do to close is quote the judge's footnote, in which the judge says in his footnote, while the general counsel presented some evidence that Hancock made a remark, made a remark, that an employee named Moore hadn't been helped by the fact that his face had recently been portrayed on a leaflet of the union, I credit Hancock's strong denial that he never made the remark, ascribed him, or any similar remark. This case can't hinge on the words or any similar remark when Hancock was plainly never asked to deny the conversation with Moore, although he denied saying at that meeting to four other people who heard it the union was involved. If the Board had credited that, we wouldn't be here, because the Board would have had to have found that the manager involved in this whole thing had plainly said to the workers, it's because of the union that we're doing this at this time. Thank you. Okay, thank you. The matter is then submitted and we'll recess until 9 a.m. tomorrow morning. All rise. This court will recess and stand adjourned. Thank you.
judges: Pregerson, Canby, Beezer